IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CURTIS REAL ESTATE, LLC             *

             Plaintiff             *

             vs.                    *   CIVIL ACTION NO. MJG-01-303

CASTLE VENTURES LIMITED, et al. *

             Defendants             *

  *        *        *        *        *        *        *        *        *

## MEMORANDUM OF DECISION

This case was tried before the Court without a jury.  The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties and had the benefit of the arguments of counsel.  The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

I.    BACKGROUND

   A.   The Principal Persons Involved

James Michael Curtis ("Curtis") had a successful professional football career with the Baltimore Colts from 1965 through 1975[1] and also engaged in the real estate business in the Baltimore - Washington area.  Beginning in the

---

[1]    Curtis also played briefly for the Seattle Seahawks and the Washington Redskins at the end of his career.

1980's, Curtis was based in the District of Columbia, acting as a broker for properties in Washington, D.C., Virginia, and Maryland.

In or about late 1998, Curtis, together with John Chapman and Robert Myers, formed Curtis Real Estate, L.L.C. ("CRE"), a limited liability company organized under the laws of the State of Maryland, with its principal place of business in the District of Columbia.

At all times here relevant, Gary Melius of New York controlled Castle Ventures, Ltd. and Company Motors Corporation (collectively "the Melius Companies"), New York Corporations.

Arbor Commercial Mortgage, L.L.C. ("Arbor") was a New York Corporation engaged in the business of real estate financing.  Daniel M. Palmieri ("Palmieri") was a Vice President of Arbor authorized to act for Arbor in regard to all matters at issue herein.

Daniel Rosenberg ("Rosenberg") was President of Sawyer Properties, a Massachusetts based company involved in syndicating real estate investments.  Rosenberg also was the principal of various entities engaged in the real estate investment business (collectively referred to herein as "Sawyer Entities").

2

B.    The Property

The instant case involves a sale of property in Randallstown, Baltimore County, Maryland, known as "Carriage Hill" (sometimes referred to herein as "the Property").

The Property, owned by Payne Webber in 1998, consisted of an 806 unit apartment development and some adjacent undeveloped acreage.  Curtis had been involved as a broker in the sale of the Property to Paine Webber and was, therefore, familiar with it.

In late 1998, Paine Webber sold the Property to the Melius Companies in a transaction financed in part by Arbor. Curtis was not a broker in connection with the 1998 sale from Paine Webber to the Melius Companies.

As discussed herein, in October 2000 the Melius Companies sold the Property to a Sawyer Entity in the transaction here at issue.

C.    Plaintiff's Claims

Plaintiff CRE seeks a recovery with regard to a Sawyer Entity's acquisition of the Property.  Plaintiff asserts claims against Arbor and the Melius Companies on the following legal theories:

3

1.   Breach of Contract[2]

2.   Unjust Enrichment[3]

3.   A Maryland statute[4]

4.   Misrepresentation[5]

Arbor, having agreed to indemnify the Melius Companies, defended the case on behalf of all Defendants.


II.   <u>DISCUSSION</u>

A.   <u>Analysis of Legal Claims</u>

The Court finds as a fact - not disputed by Defendants - that Palmieri, on behalf of Arbor, orally made a promise to Curtis, acting on behalf of CRE.   The Court finds that the promise is properly interpreted to constitute an agreement that if CRE brought in a buyer who purchased Carriage Hill, CRE would be paid reasonable compensation[6] for doing so.   CRE

---

[2]  Count I - Express Contract and Count II - Implied Contract.

[3]  Count III.

[4]   Not expressly pleaded, discussed herein.

[5]  Count IV - Fraud and Count V - Neglect.

[6]  The Court does not find credible Curtis' testimony (in any of its various versions) regarding a promise to pay a fixed percentage.

presents contract, unjust enrichment, misrepresentation and statutory claims based on the foregoing promise.

    1.  <u>Choice of Law</u>

The parties, understandably, devoted considerable time and effort to the question of whether this case should be decided under the law of the District of Columbia (which appears to bar any commission claim in the absence of a written contract[7]) or of Maryland (which permits recovery of a real estate commission without a written contract.)[8]

It is well settled that, in making a choice of law determination, the federal court hearing a case by virtue of its diversity jurisdiction must apply the conflict of law rules of the forum state.  <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co. In Inc.</u>, 313 U.S. 487, 496-97 (1941); <u>Motor Club of America Ins. Co. v. Hanifi</u>, 145 F.3d 170, 177 (4th Cir. 1998).

---

[7]    D.C. § 42-1705.

[8]    Under Maryland law, a real estate broker whose actions were the "proximate cause of interesting the purchaser [of real estate] and his ultimate agreement to buy," is entitled to a commission.  <u>Cowel v. Marletta</u>, 216 Md. 222, 228, 139 A.2d 712, 715 (Md. 1958).  The absence of a written agreement does not block a real estate broker who is the procuring cause from entitlement to a commission; <u>Glaser v. Shostack</u>, 213 Md. 383, 387, 131 A.2d 724, 726 (Md. 1957); Md. Code. Ann. Real Prop., §14-105.

Thus, Maryland choice of law principles are applied in the
instant case.

Maryland adheres to the principle of <u>lex</u> <u>loci</u> <u>contractus</u>
when dealing with brokerage contracts.  Under this principle,
"the validity and enforceability of the contract is governed
by the law of the state where the contract was made. . . .
[W]here, however, a brokerage contract is made in one state
but its performance is clearly contemplated in another state,
the law of the place of performance governs the validity of
the contract."  <u>Robert v. Construction General, Inc.</u>, 388 A.2d
168, 176 (Md. Ct. Spec. App. 1978).

The Court finds, as a factual matter, that the contract
between Arbor and CRE was made in the District of Columbia.
Moreover, the Court finds that the parties did not contemplate
that the contract would be fully performed in Maryland
although it was contemplated that at least some services would
be rendered in Maryland.  Moreover, assuming for choice of law
purposes the truth of Plaintiff's version of the facts a
critical event would have occurred in Maryland, that is the
introduction of the Property to Rosenberg and the initiation
of Rosenberg's interest.  Finally, the Court notes that
Plaintiff relies upon a Maryland statute which provides

expressly for commissions payable on the sale of real estate in Maryland.

In view of the foregoing, the Court - recognizing that the issue is not free from doubt[9] - will proceed on the assumption that Maryland law governs the instant case.

### 2.   Contract Claims

There is no basis whatsoever for any contract claim against the Melius Companies.  Palmieri was not authorized to bind these entities to any contract by virtue of actual or apparent authority.  The Melius Companies did not authorize Palmieri to enter into a contract on their behalf or to do anything that would make it appear that Palmieri was acting as their agent.  Moreover, Palmieri was at all times acting as the agent for Arbor and did nothing to make it appear that he had authority to act for anyone other than his principal, Arbor.

Palmieri acted for Arbor and entered into an oral contract with CRE for the payment of a commission (by Arbor) if CRE obtained a buyer for the Property.  Arbor acknowledges the existence - albeit not the enforceability - of the oral

---

[9]     And further recognizing that if District of Columbia law applies, Plaintiff cannot prevail on any claim.

contract.  Thus, if CRE, in fact, obtained one of the Sawyer Entities as the buyer of the Property it would have done what was required under the contract to trigger Arbor's obligation (if enforceable) to pay CRE a reasonable fee.


     3.  <u>Statutory Claim</u>

CRE seeks to rely upon a Maryland statute providing in pertinent part:

> ...[I]f a real estate broker employed to
> sell [a property] procures in good faith a
> purchaser ... and the person procured is
> accepted by the employer and enters into a
> valid, binding, and enforceable written
> contract, in terms acceptable to the
> employer, of a sale ... the broker is
> deemed to have earned the customary or
> agreed commission.

Md. Code Ann. Real Property § 14-105.

The Court will assume that the statute would be applicable to the instant transaction even though CRE's employer (Arbor) was not the owner of the Property.  The Court will, therefore, assume that if CRE had procured the purchaser, it would be entitled to a customary[10] commission by virtue of the Maryland statute.

---

[10]  The Court finds, as a fact, that there was no agreement as to the amount of any commission to be paid.

8

4.   <u>Unjust Enrichment</u>

In Maryland, a claim based on the doctrine of unjust enrichment requires proof of:

> a.   A benefit conferred upon the defendant by the plaintiff;
>
> b.   Appreciation or knowledge by the defendant of the benefit; and
>
> c.   Acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

<u>Mass Transit Admin. v. Granite Construction Co.</u>, 57 Md. App. 766, 775, 471 A.2d 1121, 1125 (1984); <u>see also</u> <u>Plitt v. Greenberg</u>, 242 Md. 359, 219 A.2d 237, 241 (1966).  However, a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties. <u>First National Bank v. Burton, Parsons & Co.</u>, 57 Md. App. 437, 451 (Md. Ct. Spec. App. 1984), <u>cert. denied</u>, 300 Md. 88 (1984).

There is no viable claim for unjust enrichment against the Melius Companies.  They received no benefit from CRE and were aware, at most, that CRE might be claiming some commission in regard to the sale of the Property.  Moreover, inasmuch as CRE would be compensated, if at all, by Arbor, it

would not be inequitable for the Melius Companies to retain any benefit that it might have received from CRE's actions.

There is no viable unjust enrichment claim against Arbor because there was an express oral contract between Arbor and CRE.  Furthermore, even if there were a cognizable unjust enrichment claim it would be duplicative of the contract and statutory based claims.  That is, CRE would be entitled to recover reasonable compensation if it had provided the buyer for the Carriage Hill sale.  This is neither more nor less than CRE would be entitled to under its contract and statutory based claims.

         5.   <u>Misrepresentation Claims</u>

Under Maryland law, a plaintiff may recover for a fraudulent or negligent misrepresentation.

To establish a fraudulent representation claim, a plaintiff must prove, by clear and convincing evidence, that: 1) a false representation was made; 2) its falsity was either known to the maker or the representation was made with such reckless indifference to the truth as to be equivalent to actual knowledge of falsity; 3) the representation was made for the purpose of defrauding the plaintiff; 4) the plaintiff not only relied on the representation, but had a right to rely

on it and would not have done the thing from which the injury
arose had the misrepresentation not been made; and 5) the
plaintiff actually suffered damage directly resulting from the
misrepresentation.  <u>See</u> <u>Swinson v. Lords Landing Vill. Condo.</u>,
360 Md. 462, 476 (2000).

   To establish a negligent misrepresentation claim, a
plaintiff must prove, by a preponderance of the evidence,
that: 1) the defendant, owing a duty of care to the plaintiff,
negligently asserted a false statement; 2) the defendant
intended that the statement be acted upon by the plaintiff; 3)
the defendant had knowledge that the plaintiff would probably
rely on the statement, which, if erroneous, would cause loss
or injury; 4) the plaintiff, justifiably, took action in
reliance on the statement; and 5) the plaintiff suffered
damage proximately caused by the defendant's negligence. <u>See</u>
<u>Martens Chevrolet, Inc. v. Seney</u>, 292 Md. 328, 337 (1982).

   The existence of a false statement is an essential
element of the tort of fraudulent or negligent
misrepresentation.  CRE contends that Palmieri falsely
represented that he was authorized to act on behalf of the
Carriage Hill owners, that is, the Melius Companies.  Palmieri
made no such representation.

Moreover, even if Palmieri had made the misrepresentation alleged, CRE took no action in reliance upon any such statement and suffered no damage as a consequence.  As noted above, Palmieri truthfully stated that he was acting on behalf of Arbor and made a promise on behalf of Arbor that CRE would be compensated if it obtained a buyer for the Property.

Accordingly, there is no basis for either of CRE's misrepresentation claims.


    6.  <u>Procuring Cause</u>

As discussed above, CRE's claim is based upon a contract or statutory theory that requires it to prove that CRE was a "procuring cause" of the sale of Carriage Hill to a Sawyer Entity.  If it were a procuring cause, CRE could prevail by virtue of the oral agreement between Arbor (by Palmieri) and CRE (by Curtis) or by virtue of the Maryland statute.

As stated by Judge Wilner in <u>Anderson-Stokes, Inc. v.</u> <u>Muslimani</u>, 574 A.2d 320, 323 (Md. App. 1990):

> ...[T]here have been literally dozens of cases in the Court of Appeals dealing with a broker's entitlement to commission on the sale of real estate ... [T]he issue ordinarily becomes whether the broker was the procuring cause of the ultimate sale. . . .
>     The Court has expressed the law in a number of ways.

12

In <u>Hampton Park v. T.D. Burgess Co.</u>,
270 Md. 269, 311 A.2d 35 (1973), the Court
... noted the long-standing rule, first
enunciated in <u>Keener v. Harrod</u>, 2 Md. 63,
71 (1852), that:

"[T]he mere fact of the agent
having introduced the purchaser
to the seller, or disclosed names
by which they came together, to
treat, will not entitle him to
compensation; but, if it appears
that such introduction or
disclosure was <u>the foundation on
which the negotiation was begun
and conducted, and the sale made</u>,
the parties cannot afterwards, by
agreement between themselves,
withdraw the matter from the
agent's hands, so as to deprive
him of his commission."

\* \* \*

The Court also recited,
however, several other
expressions from earlier cases.
From <u>Cowal v. Marletta</u>, 216 Md.
222, 228, 139 A.2d 712 (1958)
came the thought that whether a
broker's efforts are to be
regarded as the procuring cause
of a sale is to be determined not
on the basis of how much or how
little he did but on the basis of
"whether the efforts he did make
were in fact the proximate cause
of  interesting the purchaser,
and his ultimate agreement to
buy."

\*     \*     \*

This Court would put the definition of "procuring cause" in a nutshell[11] by stating - although largely begging the question - that a broker is the "procuring cause" of a sale if the broker's actions were a proximate cause of the sale.

B.  <u>Operative Facts</u>

As noted above, the Melius Companies bought the Property in October of 1998 in a transaction financed in part by a $7,500,000 loan from Arbor.  By 1999, the Melius Companies were having problems performing their obligations and the Property financing  had become a problem loan in Arbor's portfolio.

At this time, Palmieri was engaged in asset management for Arbor whereby he monitored loans for performance.  One of the loans with which he was concerned was the Melius loan.  By early 1999, Palmieri was interested in resolving the Melius loan problem by facilitating a sale of the Property.  Melius was also interested in a potential sale at a right price.  Palmieri, therefore, provided data regarding Carriage Hill to various potential purchasers and brokers.  One of the brokers was Curtis, acting for CRE.

---

[11]   It has been aptly said that it is one thing to put a legal concept into a nutshell and another to keep it there.

14

Palmieri told Curtis that if CRE found a buyer for
Carriage Hill, CRE would be compensated.  The Court finds
that, in context, Palmieri made a promise to pay CRE a fee if
it found a buyer for the Property.  The amount of the fee was
not specified,[12] but, under the circumstances and in context,
Palmieri was obligated to pay what would constitute a
reasonable fee for such services as CRE would provided in the
course of obtaining the buyer.

Palmieri also told Curtis he that wanted discrete
dealings with a few quality buyers.  Nevertheless, CRE sought
to find a buyer through what can best be described as a
"telephone book" approach.  Thus, information packages were
sent "cold" to a large list of unscreened parties.  This
approach yielded some responses to CRE, but no interest at a
price that was realistically potentially acceptable.  Indeed,
one purported "response" to CRE was a letter of intent from
Myers,[13] a CRE principal, to Curtis indicating interest at a
purchase price of $32,000,000.

---

[12] As previously noted, those of the several versions of
Curtis' testimony that included a promise to pay a specific
percentage lack credibility.

[13] Using the name of his own company so as to appear to
be an independent potential purchaser.

15

Until October 15, 1999 Rosenberg, the principal of the ultimate purchaser, had no contact with Melius or the Property.  On that date, Rosenberg was in Maryland and received a telephone call from Barry Gelda ("Gelda"), a New York real estate broker who had previously told Rosenberg of potentially interesting real estate investments.  Gelda advised Rosenberg that there was a property for sale in Maryland consisting of approximately 800 units that was listed with a New York broker.  Rosenberg wished to go to see the property immediately but Gelda stated that he could not tell him the details unless and until Rosenberg executed a confidentiality agreement.  Rosenberg told Gelda to sign the agreement on behalf of Rosenberg and stated that Gelda would be taken care of.[14]  Gelda, in New York, signed Rosenberg's name for him, identified the property for sale as Carriage Hill and gave the location.  Rosenberg then went to see the Property.  The next day, October 16, 1999, Rosenberg was in New York and received from Gelda an information package regarding Carriage Hill.

On October 20, 1999, Curtis took Palmieri to Rosenberg's office in Bethesda, Maryland to introduce him in connection

---

[14]    Gelda ultimately was paid a $50,000 commission on the Carriage Hill sale.

16

with certain properties unrelated to Carriage Hill (the Rittenhouse and Lynnwood properties).  Curtis had not, at that time, had any communication with Rosenberg about Carriage Hill.

Prior to Palmieri and Curtis' arrival at Rosenberg's office on October 20, 1999 meeting,  Palmieri told Curtis not to discuss Carriage Hill with Rosenberg.[15]  Nevertheless, in the course of the October 20 meeting, Curtis sought to introduce the matter of Carriage Hill.  When Carriage Hill was mentioned, Rosenberg stated that he already knew of the Property and was dealing with a New York broker (Gelda) about it.  There was no substantive discussion of the Property.

Rosenberg's interest in the Property, initiated by Gelda, led to a November 2, 1999 letter of intent to purchase the property for $38,500,000 which Rosenberg sent to "Owner of Record" of Carriage Hill care of Palmieri.  Thereafter, albeit sporadically at times, negotiations proceeded, leading to a contract of sale at a price of $ 38,000,000 (subject to certain adjustments) entered into July 1, 2000 and culminated with a closing on October 31, 2000.   Although Curtis made

---

[15]    Palmieri was, with justification, concerned about Curtis' modus operandi (utilized in other deals) of trying to insert himself uninvited into real estate transactions so as to make questionable claims for commissions.

efforts to insinuate CRE into the transaction, CRE had no material participation in the sale.[16]

The question presented is whether CRE is a "procuring cause" of the sale of the Property from the Melius Companies to a Sawyer Entity.

As discussed above, one can summarize the Maryland law as equating a procuring cause to a proximate cause of the sale. Or, perhaps more precisely, a broker would be considered the procuring cause of a sale if "the sale was accomplished as a result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations." Sanders v. Devereux, 189 A.2d 604, 611 (Md. 1963). Of course, as perceptively stated by Judge Wilner, "[t]he real difficulty is not with the statement of these general principles, but with their application." Anderson-Stokes, 574 A.2d at 323.

There can, doubtless, be cases in which the application of the legal principles relating to procuring cause to the facts would be difficult. The instant case, however, is not one of these. By no means whatsoever was CRE a procuring

---

[16]    The most that CRE did was to get Rosenberg's agreement that CRE could seek buyers for the undeveloped land which would be acquired as part of the acquisition of the Property.  CRE sent a "telephone book" solicitation but did not obtain a buyer for the then yet to be acquired land.

cause of the sale at issue.  Indeed, CRE - through Curtis - did no more than seek to insinuate itself into the transaction so as to create a basis to make a totally unjustified demand for compensation and to extract a totally undeserved payment.

Accordingly, the Court unequivocally finds for the Defendants herein.

III. <u>CONCLUSION</u>

For the foregoing reasons, Judgment shall be entered by separate Order for the Defendants, dismissing Plaintiff's claims with prejudice and awarding Defendants all assessable costs.


SO DECIDED on <u>Thursday, September 11, 2003</u>.


_____/ s /_____
Marvin J. Garbis
United States District Judge
